CHARLES D. SWIFT (D.C. ID No. 987353)
        cswift@clcma.org
CHRISTINA A. JUMP (D.C. ID No. TX151)
        cjump@clcma.org
LEILA E. MUSTAFA (D.C. ID No. TX0169)
        lmustafa@clcma.org
Constitutional Law Center for Muslims in America (CLCMA)
833 E. Arapaho Rd., Ste. 102
Richardson, TX 75081
Tel: (972) 914-2507; Fax: (972) 692-7454

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF COLUMBIA**

| | |
|---|---|
| **MOHAMMED JIBRIL** and **AIDA SHAHIN**, individually, and on behalf of their minor children **H.J.**, **Y.J.**, and **O.J.**; **ALA'A JIBRIL**, individually; and **KHALID JIBRIL**, individually, and whose addresses are all 3207 Lester Ave., Clovis, CA, 93619, | CASE NO.: 1:19-cv-2457 |
| *Plaintiffs,* | |
| vs. | CIVIL ACTION |
| | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| **KEVIN MCALEENAN**, in his official capacity as Acting Secretary of the Department of Homeland Security, and whose official address is 245 Murray Lane SW, Washington, DC 20528; **DAVID PEKOSKE**, in his official capacity as Administrator of the Transportation Security Administration, and whose official address is 6595 Springfield Center Dr., Springfield, VA 22150; **MARK MORGAN**, in his official capacity as Acting Commissioner of U.S. Customs and Border Protection, and whose official address is 1300 Pennsylvania Ave., NW, Washington, DC 20229; **WILLIAM BARR**, in his official capacity as | |

Attorney General of the United States, and
whose official address is 950
Pennsylvania Ave., NW, Washington, DC
20530; **CHRISTOPHER WRAY**, in his
official capacity as Director of the Federal
Bureau of Investigation, and whose
official address is 935 Pennsylvania
Avenue, NW, Washington, DC 20535;
and **CHARLES KABLE, IV**, in his
official capacity as Director of the
Terrorist Screening Center, and whose
official address (or that of its
administering Agency, the FBI) is 935
Pennsylvania Avenue, NW, Washington,
DC 20535,

*Defendants.*

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

Plaintiffs are seven members of the Jibril family, including minor children, who, by and through undersigned counsel, file this Complaint for Injunctive and Declaratory Relief, against official capacity Defendants Kevin McAleenan, David Pekoske, Mark Morgan, William Barr, Christopher Wray, and Charles Kable, IV. As set forth in additional detail in this Complaint, Plaintiffs encounter extreme burdens and hardship every time they travel, which results in infringements upon their constitutional rights. Upon information and belief, these experiences are consistent with the treatment of persons named on the Terrorist Watch List (or Selectee List). Plaintiffs initiate this action in order to challenge the constitutionality of the Defendants' policies and actions, and the lack of procedural due process and adequacy provided by these policies. This Complaint is supported by the following factual background and claims for relief:

## I.   **PARTIES**

1.   Plaintiff Mohammed Jibril is a U.S. citizen of Jordanian national origin and resident of Clovis, California. Plaintiff identifies as Muslim. Plaintiff Mohammed Jibril is married to Plaintiff Aida Shahin. Together, they have five children, two of which are adults and named Plaintiffs: Ala'a Jibril and Khalid Jibril, and three of which are minor children: Plaintiffs H.J., Y.J., and O.J.

2.   Plaintiff Aida Shahin is a U.S. citizen of Jordanian national origin and resident of Clovis, California. Plaintiff identifies as Muslim. Plaintiff Aida Shahin is married to Plaintiff Mohammed Jibril. Together, they have five children, two of which are adults and named Plaintiffs: Ala'a Jibril and Khalid Jibril, and three of which are minor children: Plaintiffs H.J., Y.J., and O.J.

3.   Plaintiff Ala'a Jibril is a U.S. citizen and resident of Clovis, California.

4.   Plaintiff Khalid Jibril is a U.S. citizen and resident of Clovis, California.

5.   Plaintiff H.J. is a minor child. He is a U.S. citizen and resident of Clovis, California. His interests are represented by his parents, Mohammed Jibril and Aida Shahin, who are also Plaintiffs in this suit.

6.   Plaintiff Y.J. is a minor child. He is a U.S. citizen and resident of Clovis, California. His interests are represented by his parents, Mohammed Jibril and Aida Shahin, who are also Plaintiffs in this suit.

7.   Plaintiff O.J. is a minor child. He is a U.S. citizen and resident of Clovis, California. His interests are represented by his parents, Mohammed Jibril and Aida Shahin, who are also Plaintiffs in this suit.

8.   Defendant Kevin McAleenan is the Acting Secretary of the U.S. Department of Homeland Security (hereinafter "DHS"). DHS oversees several components, including the Transportation Security Administration (hereinafter "TSA") and U.S. Customs and Border Protection (hereinafter "CBP"). Defendant McAleenan is sued in his official capacity.

9.   Defendant David Pekoske is the Administrator of the TSA. The TSA is a component agency of the DHS. Defendant Pekoske is sued in his official capacity.

10.    Defendant Mark Morgan is the Acting Commissioner of CBP. CBP is a component agency of the DHS. Defendant Morgan is sued in his official capacity.

11.    Defendant William Barr is the Attorney General of the United States and leads the Department of Justice (hereinafter "DOJ"). The DOJ oversees the Federal Bureau of Investigation (hereinafter "FBI"). Defendant Barr is sued in his official capacity.

12.    Defendant Christopher Wray is the Director of the FBI. The FBI administers the Terrorist Screening Center ("TSC"), which was created to consolidated the U.S. government's approach to terrorism screening. Defendant Wray is sued in his official capacity.

13.    Defendant Charles Kable, IV is the Director of the TSC. The TSC is responsible for management and operation of the Terrorist Screening Database (hereinafter "TSDB"). Defendant Kable is sued in his official capacity.

## II.    JURISDICTION AND VENUE

14.    This Court has jurisdiction under the authority of 28 U.S.C. § 1331 (federal question), because this action arises, in part, under the Fourth and Fifth Amendments of the United States. Jurisdiction is also conferred pursuant to 5 U.S.C. § 555(b) and § 702 (Administrative Procedure Act), by way of the relief sought under 28 U.S.C. § 2201 – 2202 (Declaratory Judgment Act), which enables parties to bring lawsuits in federal court to obtain declaratory relief not otherwise available.

15.    Venue is appropriate in this Court under 28 U.S.C. § 1391(e)(1), which states in relevant part that "a civil action in which a defendant is an officer or employee of the United States or agency thereof acting in his official capacity…may…be brought in any judicial district in which (A) a defendant in the action resides."

### III.   FACTUAL BACKGROUND

**A.   The Department of Homeland Security**

16.   A primary mission of the DHS is to prevent terrorist attacks within the United States.

17.   Another priority of the DHS is to ensure that the civil rights and liberties of persons are not diminished by efforts, activities, and programs aimed at securing the homeland.

18.   DHS has several operational and support components, including agencies like the TSA and CBP.

**B.   The Transportation Security Administration**

19.   Pursuant to 49 U. S. C. § 114, the TSA is the DHS component that is primarily responsible for security in all modes of transportation, including screening operations for passenger air transportation.

20.   The TSA develops policies addressing threats to transportation security.

21.   One of its policies states that "[m]odified screening procedures are in place to reduce the likelihood of a pat-down [search]" in relation to children.[1]

22.   The TSA receives, assesses, and distributes intelligence information when it relates to transportation security.

23.   The TSA acts as the primary liaison for transportation-related security to law enforcement and intelligence communities.

24.   The TSA may notify appropriate officials "of the identity of individuals known to pose, or suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety,"[2] or a threat to transportation security generally.

---

[1] Screening Your Child, https://tsa.gov.travel/special-procedures/traveling-children (last visited Aug. 13, 2019).
[2] 49 U.S.C. § 114(h)(2).

25.   In consultation with other Federal agencies, the TSA requires all air carriers to use information from Federal agencies to identify individuals on passenger lists who may be a threat to civil aviation or national security.

26.   In consultation with other appropriate Federal agencies, the TSA requires all air carriers to prevent individuals who may be a threat to civil aviation or national security from boarding aircrafts.

**C.   U.S. Customs and Border Protection**

27.   Per its website, CBP is "one of the world's largest law enforcement agencies […] charged with keeping terrorists and their weapons out of the U.S. while facilitating lawful international travel."[3]

28.   CBP is the DHS component agency responsible for securing U.S. borders at points of entry.

29.   CBP is the primary agency responsible for screening passengers arriving into the United States.

30.   CBP also conducts "the same immigration, customs, and agriculture inspections of international air travelers typically performed upon arrival in the United States before departure" from certain "Preclearance locations," such as Abu Dhabi.[4]

31.   Per its stated policies, "[a]ll searches must be conducted under the appropriate legal authority and standards."[5]

32.   Accordingly, the scope of immediate pat-down searches or *Terry* frisks "must be limited to those areas on a detainee where an officer/agent suspects a weapon or dangerous object may be concealed."[6]

33.   Prior supervisory authorization must be obtained prior to patting down minors, with the exception of immediate pat-down searches.

---

[3] About CBP, https://www.cbp.gov/about (last visited Aug. 8, 2019).
[4] Preclearance Locations, https://www.cbp.gov/border-security/ports-entry/operations/preclearance (last visited Aug. 13, 2019).
[5] U.S. Customs and Border Protection National Standards on Transport, Escort, Detention, and Search (hereinafter "CBP TEDS Policy"), Oct. 2015, at 9, *available at* https://www.cbp.gov/sites/default/files/assets/documents/2017Sep/CBP%20TEDS%20Policy%20Oct2015.pdf.
[6] *Id.* at 10.

34.    In other words, pat-down searches of juveniles while they are detained requires prior supervisory authorization.

35.    CBP policies dictate that "agents should weigh all factors before requesting authorization to further search a juvenile."[7]

36.    CBP policies state that "[e]very effort must be made to hold detainees for the least amount of time required for their processing […] and as operationally feasible."[8]

37.    Upon arrival into holding rooms, CBP officers must ask those being detained about, and visually inspect for, any sign of injury, illness, or health concerns. The agents must also ask the detainees whether they take any prescription medications.

38.    The general DHS policy is that family units with minor children should not be separated while detained for extra questioning and searches.

39.    In circumstances where family units with juveniles must be separated, such as in circumstances where there are varying immigration dispositions within a family, this separation must be documented in the appropriate electronic record systems.

40.    Adult detainees are to be provided with food at regularly scheduled mealtimes, and snacks in between regularly scheduled meal times.

41.    Minor detainees must be offered a snack upon arrival and a meal every six hours while detained.

**D.    The Terrorist Screening Center and the Terrorist Screening Database**

42.    The TSC is a multi-agency center administered by the FBI.

43.    The TSC develops and maintains the TSDB, which is commonly referred to as the "Terrorist Watch List."

---

[7] *Id.* at 21.
[8] *Id.* at 14.

44.   The TSDB is the federal government's consolidated database of known or suspected terrorist records.

45.   The TSDB contains identifying information of persons known or reasonably suspected to be domestic or international terrorists.

46.   The procedure for inclusion in the TSDB is commonly referred to as the nomination process.

47.   Generally, nominations to the TSDB must satisfy two basic requirements: first, that the facts and circumstances pertaining to the TSDB nomination must meet the reasonable suspicion standard of review; and second, that the biographic information associated with a nomination contains sufficient identifying data.

48.   Meeting the "reasonable suspicion" standard of review only requires "articulable intelligence or information which, based on the totality of circumstances and, taken together with rational inferences from those facts, creates a reasonable suspicion that the individual is engaged, has been engaged, or intends to engage, in conduct in preparation for, in aid or in furtherance of, or related to, terrorism and/or terrorist activities."[9]

49.   In assessing the totality of the circumstances, factors that are assessed may include race, ethnicity, country of origin, religion, religious practices, languages spoken, family, associations, travel history, and social media history.

50.   A person's identifying information may be placed within the TSDB without being subject to an ongoing government investigation.

51.   "Concrete facts are not necessary" for placement within the TSDB.[10]

52.   Uncorroborated facts of low reliability, and mere suspicion, can serve as bases for nomination.

---

[9] March 2013 Watchlisting Guidance, available at https://theintercept.com/document/2014/07/23/march-2013-watchlisting-guidance, at 34 (last visited Aug. 8, 2019).
[10] March 2013 Watchlisting Guidance, available at https://theintercept.com/document/2014/07/23//march-2013-watchlisting-guidance, at 34 (last visited Aug. 8, 2019).

53.   Individuals may be nominated based on travel patterns to certain countries in the Middle East, East Asia, or Africa, even if the persons are from those countries originally.

54.   Individuals may be nominated based on travel abroad to fulfill religious obligations, such as Hajj or pilgrimage to Mecca.

55.   Individuals may be nominated based on attending the same religious institution as another individual the government considers suspicious.

56.   The relevant "totality of the circumstances" analysis and reasonable suspicion standard of review applicable to the nomination process disproportionally impacts Muslims or individuals from Muslim-majority countries.

57.   Upon information and belief, individuals who identify as Muslim are the majority of persons identified in the TSDB, even though Muslims are a minority within the United States.

58.   Upon information and belief, individuals who identify as Muslim are the majority of persons identified in the TSDB, even though most domestic terrorist acts within the United States are committed by non-Muslims.

59.   The TSDB has at least two subsets: the "No Fly List" and the "Selectee List."

60.   The Selectee List is commonly referred to as the Terrorist Watch List.

61.   Individuals on the Selectee List (sometimes referred to herein as "Selectee List persons" or "Selectee List passengers") are almost always subject to enhanced screenings at border crossings, including airports.

62.   Selectee List persons typically have "SSSS" printed on their boarding passes.

63.   "SSSS" stands for Secondary Screening Security Selection, and is commonly referred to as a "Quad S" designation.

64.    Selectee List persons typically cannot obtain boarding passes at kiosks or on their phones. Instead, they must speak with airline ticketing personnel at ticketing counters.

65.    Ticketing counter personnel typically must call government agents, including but not limited to TSA agents, prior to issuing Selectee List persons their boarding passes. These agents and officials usually must ask Selectee List passengers several questions, which occur after these individuals wait at the ticketing counter for the officials to arrive. This process can take several hours and can result in the Selectee List persons missing their scheduled flights.

66.    Selectee List persons typically encounter enhanced screening measures that can take several hours on departing flights at U.S. airports. This process can result in these individuals missing their scheduled flights.

67.    Selectee List persons often encounter extreme difficulties traveling abroad, including being detained in foreign countries for extended periods of time, or being prohibited from entering them altogether, due to the dissemination of the TSDB to foreign governments.

68.    Selectee List passengers often have their electronic devices seized, including cell phones, without a warrant or probable cause.

69.    Upon information and belief, the TSC rejects only approximately one percent of all nominations within the TSDB.

70.    The above-mentioned nomination standards violate the procedural due process rights of individuals whose names are contained within the TSDB.

71.    The above-mentioned nomination standards are arbitrary and capricious.

72.    The TSC disseminates the information contained within the TSDB to local authorities, foreign governments, and private contractors.

73.     Dissemination of the Selectee List is so widespread that it is tantamount to public disclosure, even assuming the list is only disseminated to local authorities, foreign governments, and private contractors.

74.     The TSC is the sole entity with the authority to remove persons from the Selectee List, which is commonly referred to as the Terrorist Watch List.

75.     Individuals cannot seek redress directly from the TSC.

76.     Selectee List persons are not notified before, during, or after they are placed or removed from the Selectee List.

77.     Selectee List persons are not told the reasons for their placement on the Selectee List.

78.     Selectee List persons lack a meaningfully adequate opportunity to challenge their placement on the Selectee List.

**E.      Department of Homeland Security's Traveler Redress Inquiry Program**

79.     The DHS Traveler Redress Inquiry Program (hereinafter "DHS TRIP") is the administrative avenue through which aggrieved travelers may "seek resolution regarding difficulties they experienced during their travel screening at transportation hubs," including Watch List issues or situations "where travelers believe they have been unfairly or incorrectly delayed, denied boarding or identified for additional screening."[11]

80.     Guiding DHS TRIP regulations require aggrieved travelers to initiate the redress process by submitting redress inquiry forms.

81.     DHS TRIP applicants receive a redress confirmation number after the submission of their DHS TRIP inquiries.

82.     Upon receipt of a DHS TRIP inquiry and all requisite documents, the TSA, in coordination with the TSC and other appropriate federal law enforcement or intelligence agencies, reviews the available

---

[11] DHS Traveler Redress Inquiry Program (DHS TRIP), https://www.dhs.gov/dhs-trip (last visited Aug. 8, 2019).

documentation and information relevant the individual seeking redress and "correct[s] any erroneous information, and provide the individual with a timely written response."[12]

83.   After the conclusion of the aforementioned agency review process for inquiring Selectee List persons, DHS TRIP sends a standardized form letter, which neither confirms nor denies the existence of any Watch List records pertaining to them.

84.   This standardized form letter does not state whether any Watch List records pertaining to the Selectee List persons exist.

85.   This standardized form letter does not provide Selectee List persons with notice for any (undisclosed) placement on a TSDB list.

86.   This standardized form letter does not state how the relevant agencies resolved the application.

87.   Selectee List persons are not provided with an adequate opportunity to be heard before placement on the Selectee List.

88.   Selectee List persons remain wholly unaware of the nature of their placement on the Selectee List after the conclusion of the DHS TRIP process.

89.   As Selectee List persons are unaware of any reason supporting their placement on the Terrorist Watch List, these individuals are unable to even attempt to rebut any allegations against them.

90.   The DHS TRIP process is legally inadequate, as it fails to provide Selectee List persons with a constitutionally adequate mechanism through which they can challenge the TSC's decision to include their identifying information within the TSDB.

91.   The DHS TRIP process provides Selectee List persons with no constitutionally adequate mechanism, as these individuals receive no notice or meaningful opportunity to contest their placement within the TSDB.

---

[12] 49 C.F.R. § 1560.205(d).

**F.    Plaintiffs' Experiences Traveling and Subsequent DHS TRIP Applications**

92.    Plaintiffs are seven members of the Jibril family, who are all U.S. citizens.

93.    Plaintiffs have no mental health concerns.

94.    In the spring and summer of 2018, the Jibril family traveled to the Middle East, in order to visit family members in Jordan.

95.    Their outgoing travel involved departing from Los Angeles, California; connecting in Abu Dhabi, United Arab Emirates; and landing in Amman, Jordan, where the family stayed for over two months.

96.    In preparation for their travel, Plaintiffs arrived at the ticketing counter in Los Angeles to obtain their boarding passes. The family waited about one hour to receive their boarding passes, all of which had "SSSS" printed on them.

97.    The family was searched for about two hours (in addition to the one hour where the family awaited the issuance of their boarding passes). During this search, all Plaintiffs were pat down, including the minor children Plaintiffs.

98.    Neither Plaintiff Mohammed Jibril nor Plaintiff Aida Shahin were asked for permission prior to the pat-down searches of the minor children Plaintiffs.

99.    Once the Jibril family finally arrived to the gate of their plane, they were met by DHS agents.

100.    The DHS agents took the Jibril family to a private area, where the agents searched the family's luggage.

101.    Due to this additional round of extensive screening, the Jibril family came close to missing their flight to Abu Dhabi.

102.    Once the Jibril family arrived in Jordan, the Plaintiffs were interrogated for about two hours.

103.  In August, 2018, after remaining in Jordan for roughly two months, the Jibril family began their travels home to Los Angeles, California, which involved an intermediary flight to Abu Dhabi, United Arab Emirates.

104.  At the Jordanian airport, Plaintiff Mohammed Jibril was told that American officials have an issue with him, and that the family's names would need to be cleared prior to the family boarding the plane.

105.  All family members had SSSS printed on the boarding passes they eventually received.

106.  After arriving in United Arab Emirates, the family was interrogated for roughly 45 minutes by Abu Dhabi officials.

107.  CBP agents at the Preclearance location in Abu Dhabi detained the Plaintiffs separated the Plaintiffs from one another, and interrogated them for at least four hours.

108.  Plaintiff Mohammed Jibril was interrogated by himself. He was separated from his minor children during this time.

109.  Plaintiff Aida Shahin was in the waiting room part of the time, and interrogated by herself on several occasions.

110.  Plaintiff Khalid Jibril was interrogated by himself for a period of time, and otherwise waited in the waiting room.

111.  Plaintiff H.J., who is a minor, was interrogated by himself for a period of time without either of his parents. He otherwise waited in the waiting room.

112.  Plaintiff O.J. remained in the waiting room with his sister, Ala'a Jibril, and at several points during the family's detention without either of his parents.

113.  All electronic devices were searched, including the Plaintiffs' cell phones.

114.  These cell phone searches occurred without warrant or probable cause.

115.  The agents mishandled the Plaintiffs' electronic devices and luggage.

116.  The food and spices the Jibril family packed were searched and, subsequently, thrown out by the agents.

117.  The minor children Plaintiffs were not offered any food upon their arrival to the CBP holding room.

118.  The Plaintiffs had to stay in Abu Dhabi overnight because they missed their scheduled return flight home to Los Angeles, due to prolonged detention by CBP officials.

119.  No members of the Jibril family, including minor children, were asked if they had any medical conditions requiring treatment, during their first night of detention in Abu Dhabi.

120.  After the Jibril family returned to the Abu Dhabi airport after staying overnight due to prolonged detention, the Jibril family's electronic devices were searched again.

121.  The extensive security measures involved a delay of at least one hour, despite all security measures and screenings that occurred the day before.

122.   Plaintiffs are Muslims with sincerely held religious beliefs that require traveling to Saudi Arabia to complete Hajj and pilgrimage obligations.

123.  The extensive security screening Plaintiffs are forced to go through any time they travel is, upon information and belief, consistent with the treatment Selectee List persons, or persons on the Terrorist Watch List, receive.

124.   Due to the invasive and egregious treatment the family experiences when they travel, including but not limited to having SSSS printed on their boarding passes, expecting their cell phones to be searched, and expected prolonged detentions, the family feels their religious exercise is burdened.

125.   These experiences brought extreme emotional distress to the Jibril family, and in particular the minor children, who felt they were treated like criminals by the Defendants.

126.  On March 1, 2019, Plaintiffs Mohammed Jibril and Aida Shahin, by and through the

undersigned counsel, initiated redress inquiries through the DHS Traveler Redress Inquiry Program ("DHS TRIP") to acquire information as to why they receive scrutinized treatment when traveling, and a way to appeal this treatment.

127.   On March 20, 2019, Plaintiffs Ala'a Jibril, Khalid Jibril, and minor children H.J., Y.J., and O.J., submitted TRIP complaints, by and through the undersigned counsel. These DHS TRIP redress inquiries mentioned the relevant reference numbers of their parents' inquiries.

128.   Plaintiff Mohammed Jibril's DHS TRIP reference number is 2285573.

129.   Plaintiff Aida Shahin's DHS TRIP reference number is 2285495.

130.   Plaintiff Ala'a Jibril's DHS TRIP reference number is 2285860.

131.   Plaintiff Khalid Jibril's DHS TRIP reference number is 2285857.

132.   Plaintiff H.J.'s DHS TRIP reference number is 2285859.

133.   Plaintiff Y.J.'s DHS TRIP reference number is 2285853.

134.   Plaintiff O.J.'s DHS TRIP reference number is 2285856.

135.   On June 13, 2019, DHS TRIP sent its standard response letter for persons who are not on the No Fly List, but who could be on the Selectee List, in response to Plaintiff Ala'a Jibril's DHS TRIP inquiry. This letter states, in part, that "DHS has researched and completed our review of your case. DHS TRIP can neither confirm nor deny any information about you which may be within federal watchlists or reveal any law enforcement sensitive information. However, we have made any corrections to our records that our inquiries determined were necessary, including, as appropriate, notations that may assist in avoiding incidents of misidentification."

136.   On July 2, 2019, DHS sent the same type of response letters in response to Plaintiff Mohammed Jibril and Plaintiff Aida Shahin's TRIP complaints. These standard responses also did not confirm or deny whether these Plaintiffs were on the Selectee List or if they can expect similar difficulties while

traveling in the future.

137.   On July 23, 2019, DHS issued response letters in relation to the inquiries of Plaintiff Khalid Jibril, minor Plaintiff Y.J., and minor Plaintiff O.J.[13] These standard responses also did not confirm whether these Plaintiffs were on the Selectee List or if they can expect similar difficulties while traveling in the future.

138.   Neither minor Plaintiff H.J. nor his parents received a responsive determination letter as to H.J.'s DHS TRIP application as of the date of this filing.[14]

139.   In addition to needing to travel overseas to fulfill their sincerely-held religious beliefs and the resulting obligations, the Jibril family wishes to travel to Jordan to see family in the near future, as consistent with their prior travel patterns.

140.   The Jibril family has routinely traveled to Jordan every two to three years.

141.   Plaintiff Mohammed Jibril, in particular, has visited relatives in Jordan 12-15 times over the past 25 years.

142.   The DHS TRIP redress process represents the Plaintiffs' only avenue by which to challenge their apparent Watch List placement and the resulting infringements on their constitutionally protected rights and liberties.

---

[13] While the determination letter in response to Plaintiff O.J.'s DHS TRIP inquiry also fails to confirm or deny whether Plaintiff O.J. is on the Watch List (and similarly whether similar issues are to be expected in the future), Plaintiff O.J. received a slightly different response than the other Plaintiffs. The response letter states, in relevant part, that "[t]he U.S. Government has completed our review of your case. Your experience was most likely caused by a misidentification against a government record or by random selection. We regret any inconvenience that you may assist in avoiding future incident of misidentification." Upon information and belief, this response is consistent with persons who are either taken off the No Fly List, or who never were on the No Fly List, but is not standard for persons who believe they are on the Selectee List.
[14] On May 1, 2019, DHS TRIP notified Plaintiff H.J. that his passport had expired. Plaintiff H.J.'s counsel subsequently provided H.J.'s school ID and noted that H.J.'s passport was valid at the time of travel complained of in H.J.'s DHS TRIP inquiry. On July 11, 2019, DHS TRIP confirmed receipt of the school ID, stating, in part, that "[t]here is no further action necessary at this time."

143.    The lack of information from DHS TRIP in its determination letters leaves the Plaintiffs with no constitutionally adequate way to challenge the infringements on their constitutional rights to travel freely and without undue burden or substantial delay.

144.    The lack of information from DHS TRIP in its determination letters leaves the Plaintiffs with no constitutionally adequate way to challenge the chilling effects on their constitutional rights to practice their religion by traveling to Saudi Arabia to complete Hajj and pilgrimage requirements.

145.    This lack of information from the relevant agencies results in great personal harm to the Plaintiffs, not only as to their constitutional rights to travel freely but also as to their rights of procedural due process.

## V.    **CAUSES OF ACTION**

**A.    <u>Count One</u>: Violations of the Plaintiffs' Fourth Amendment Rights Due to Unreasonable Pat Down Searches and Prolonged Detentions, Against Defendants McAleenan, Pekoske, and Morgan**

146.    Plaintiffs hereby allege and incorporate by reference all numbers referenced above.

147.    Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[15]

148.    The Fourth Amendment requires reasonableness for all searches of persons and their effects, which is measured by examining the totality of the circumstances.

149.    Defendants' unreasonable treatment and prolonged detentions of the Plaintiffs, which includes numerous invasive, warrantless pat-down searches of all family members including minor children, lacks probable cause.

---

[15] U.S. Const. amend. IV.

150.    No warrants were issued prior to their prolonged detentions and numerous invasive, pat-down searches.

151.    Per CBP policies, juveniles should not be subject to pat-down searches in almost any circumstance, and not without prior supervisory authorization, unless they are immediate pat-down searches akin to *Terry* frisks.

152.    In addition, the TSA states that it should keep pat-down searches of minors to a minimum.

153.    Neither Plaintiff Mohammed Jibril nor Plaintiff Aida Shahin were asked for permission prior to any pat-down searches of their minor children by DHS agents.

154.    Due to the actions of the Defendants' agents, including but not limited to numerous invasive, warrantless pat-down searches and unreasonably prolonged detentions of the Jibril family (including its juvenile family members), the DHS, CBP, and TSA agents violated the Plaintiffs' Fourth Amendment rights.

**B.    <u>Count Two</u>: Violations of the Plaintiffs' Fourth Amendment Rights Due to Warrantless Searches of Cell Phones Without Probable Cause, Against Defendants McAleenan, Pekoske, and Morgan**

155.    Plaintiffs hereby allege and incorporate by reference all numbers referenced above.

156.    Under the Fourth Amendment, "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."[16]

157.    The Fourth Amendment requires reasonableness. The relevant analysis requires examining the totality of the circumstances.

158.    The Supreme Court finds that digital data searches do not prevent the destruction of evidence.

---

[16] U.S. Const. amend. IV.

159.   The Supreme Court finds that digital data searches do not enhance officer safety.

160.   The Supreme Court also holds that the quantitative and qualitative differences between cell phones and other containers make digital data searches especially intrusive, because individuals maintain a reasonable expectation of privacy in their cell phones even upon arrest.

161.   Defendants' unreasonable treatment of the Plaintiffs, which included invasive, warrantless searches of cell phones, lacks probable cause.

162.   No warrants were issued prior to the searches of the family's cell phones.

163.   Due to the actions of the Defendants' agents, including numerous, warrantless searches of the family's cell phones without probable cause, the DHS, CBP, and TSA agents violated the Plaintiffs' Fourth Amendment rights.

### C.   <u>**Count Three**</u>**: Violations of Plaintiffs' Fifth Amendment Procedural Rights to Due Process, Against All Defendants**

164.   Plaintiffs hereby allege and incorporate by reference all numbers referenced above.

165.   Procedural due process imposes constraints on governmental policies which deprive citizens of liberty, and property, interests, within the meaning of the Fifth or Fourteenth Amendments to the U.S. Constitution.

166.   The right to travel is a fundamental liberty interest, and the Supreme Court has held that "freedom of movement across frontiers […] may be as close to the heart of the individual as the choice of what he eats, or wears, or reads."[17]

167.   In addition, restrictions on the freedom to practice sincerely-held religious beliefs are among the deprivations of liberty the Due Process Clause was designed to protect against.

168.   Interests in reputation are also important recognized liberty interests.

---

[17] *Kent v. Dulles*, 357 U.S. 116, 126 (1958).

169.   Dissemination of the Selectee List is so widespread that it is tantamount to public disclosure.

170.   Defendants' apparent placement of the Plaintiffs in the TSDB and/or Selectee List has resulted in liberty harms, due to the extensive and invasive nature of screening measures taken against the Plaintiffs every time they travel.

171.   The fundamental right of due process requires "the opportunity to be heard 'at a meaningful time *and in a meaningful manner.*'"[18]

172.   Federal courts recognize that the "core of natural justice" rests in the right to "[h]ear the other side."[19]

173.   Due process requires "the right to know a charge, to be confronted with the accuser, to cross-examine informers and to produce evidence on one's behalf" which "is especially necessary where the occasion […] is *fear* of future misconduct, rather than crimes committed."[20]

174.   Defendants inclusion of Plaintiffs' names in the TSDB, and the dissemination of that information by federal agencies, results in the Plaintiffs' association with the stigmatizing labels of "suspected terrorists," without providing the Plaintiffs with a constitutionally adequate mechanism to challenge the label.

175.   Defendants inclusion of Plaintiffs' names in the TSDB and/or on the Selectee List, and the dissemination of that information by federal agencies, results in infringements upon their fundamental rights to travel and their free exercise of religion, without providing the Plaintiffs with a constitutionally adequate mechanism to challenge those infringements.

176.   Plaintiffs are entitled to an adequate legal mechanism that affords them notice and an

---

[18] *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) (emphasis added).
[19] *Kaur v. Holder*, 561 F.3d 957, 963-64 (9th Cir. 2009) (Noonan, J., concurring) (citing *Jay v. Boyd*, 351 U.S. 345 (1956) (Warren, C.J., dissenting); *see also United States ex rel. Mezei*, 345 U.S. 206 (1953) (Black, J., dissenting)).
[20] *Shaughnessy v. United States*, 345 U.S. 206, 224-27 (1953) (Jackson, J., dissenting) (emphasis added).

opportunity to contest these deprivations and infringements on their constitutionally protected liberty interests.

177.   The DHS TRIP administrative process provides individuals like the Plaintiffs with no adequate redress avenue to contest the deprivation of their constitutionally protected liberty interests.

178.   Plaintiffs are entitled to know the charges against him so that they may rebut them and correct errors.

179.   Plaintiffs have therefore been deprived of their constitutionally protected liberty interests without adequate procedural due process.

**D.     Count Four: Violations of the Administrative Procedure Act Due to Detention Conditions, Against Defendants Mcaleenan, Pekoske, and Morgan**

180.   Plaintiffs hereby allege and incorporate all numbered paragraphs above.

181.   Plaintiffs are persons aggrieved by agency action under the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §§ 701, 706 et seq.

182.   The relevant agency actions are final, as Plaintiffs all utilized the relevant administrative remedy, DHS TRIP.[21]

183.   Furthermore, Defendants' actions in the failure to follow its policies constitute additional final agency action within the meaning of the APA.

184.   Defendants' policies require that family units with juveniles remain together unless they must be separated, such as if the family members have different immigration statuses.

185.   As Plaintiffs are all U.S. citizens, Defendants' agents abused their discretion by separating the Jibril family unit and, accordingly, failing to follow their own stated policies.

---

[21] All Plaintiffs received Determination Letters from DHS TRIP at the conclusion of their TRIP inquiries, with the exception of minor Plaintiff H.J. who has not yet received a substantive response. Nonetheless, Congress has not mandated exhaustion of the DHS TRIP redress process, and DHS TRIP's own regulations also do not require expressly require exhaustion. In addition, courts recognize that exhaustion is not required when the administrative remedy would be plainly inadequate.

186.   Defendants' agents abused their discretion by separating minor Plaintiff H.J. from his parents.

187.   Defendants' agents abused their discretion by questioning minor Plaintiff H.J. without either of his parents.

188.   Defendants' agents did not check to see if any family members were suffering from illness or injury while detaining the Plaintiffs in Abu Dhabi.

189.   In addition, Defendants' agents did not offer food to the juvenile Defendants upon their arrival into the holding room in Abu Dhabi.

190.   Per CBP policies, juveniles should not be subject to pat-down searches in almost any circumstance, and not without prior supervisory authorization, unless they are immediate pat-down searches akin to *Terry* frisks.

191.   In addition, the TSA states that it should keep pat-down searches of minors to a minimum.

192.   Neither Plaintiff Mohammed Jibril nor Plaintiff Aida Shahin were asked for permission prior to any pat-down searches of their minor children by DHS agents.

193.   Therefore, DHS and CBP agents abused their discretion, and violated the Administrative Procedure Act by failing to follow their own stated procedures.

E.   <u>Count Five</u>: **Violations of the Administrative Procedure Act Due to Lack of Adequate Procedural Due Process Through Policies and Available Administrative Remedy, DHS TRIP, Against All Defendants**

194.   Plaintiffs hereby allege and incorporate all numbered paragraphs above.

195.   Plaintiffs are persons aggrieved by agency action under the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. §§ 701, 706 et seq.

196.   The relevant agency actions are final, as Plaintiffs all utilized the relevant administrative remedy, DHS TRIP.[22]

---

[22] *See supra* note 21.

197.   Furthermore, Defendants' actions in implementing policies or practices that permit, or fail to prevent, Defendants' arbitrary and capricious decision making and abuses of discretion, constitute additional final agency action within the meaning of the APA.

198.   As the DHS TRIP process provides the Plaintiffs with no notice and no meaningful opportunity to be heard, its policies violate the requirements of the Fifth Amendment of the U.S. Constitution, and therefore are arbitrary, capricious, an abuse of discretion, and unlawful, and should accordingly be set aside as violating the APA.

199.   Defendants' actions taken against the Plaintiffs while traveling and as described herein, including but not limited to invasive pat downs, prolonged detentions, and cell phone searches, without warrants or probable cause, are an abuse of discretion, and accordingly, unlawful, in violation of the requirements of the APA.

200.   As these actions continue to directly result in great personal harm to the Plaintiffs, Plaintiffs seek a declaration that Defendants' policies, practices, and customs, including but not limited to those specific to DHS TRIP, violate the APA, and that DHS TRIP should be revised to allow for a meaningful opportunity for persons like the Plaintiffs to be heard.

**F.    Count Six: Attorneys' Fees under the Equal Access to Justice Act**

201.   Plaintiffs hereby alleges and incorporates by reference all numbered paragraphs set forth above.

202.   The Equal Access to Justice Act, as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412 (hereinafter "the EAJA"), provides for the award of costs and attorneys' fees to a prevailing party in litigation against the United States or one of its agencies.

203.   Plaintiffs respectfully request that this Court grant EAJA costs and fees as provided for by statute.

## VI.        PRAYER FOR RELIEF

Plaintiff prays for judgment of liability against Defendant, and respectfully requests that this Court

grant the following relief:

1)  Declare that Defendants violated Plaintiffs' rights under the Fourth Amendment to the U.S. Constitution;

2)  Declare that Defendants violated Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution;

3)  Declare that Defendants' actions against Plaintiffs constitute an abuse of discretion and, accordingly, violate the APA;

4)  Declare that Defendants' continuous actions against Plaintiffs are arbitrary and capricious and, accordingly, violate the APA;

5)  Declare that Defendants' policies, practices, and customs, including but not limited to DHS TRIP, violate the APA and Constitution, and fail to allow for a meaningful opportunity for persons like the Plaintiffs to be heard;

6)  Order DHS TRIP to revise its policies to provide Plaintiffs and persons like them with a meaningful opportunity to challenge their apparent inclusion within the TSDB and/or Selectee List;

7)  Re-examine Plaintiffs' DHS TRIP inquiries once DHS TRIP revises its procedures to remove constitutional violations;

8)  Enjoin the Defendants from conducting warrantless pat-down searches of Plaintiffs in the future, unless probable cause exists;

9)  Enjoin the Defendants from conducting warrantless searches of the Plaintiffs' cell phones in the future, unless probable cause exists;

10) Award Plaintiffs' attorneys' fees and costs as provided by any applicable provision of the law, against Defendants;

11) Any additional relief this Court deems just, proper, and equitable.

Respectfully submitted this <u>13th</u> day of August, 2019.

<u>*/s/ Charles D. Swift*</u>
<u>*/s/ Christina A. Jump*</u>
<u>*/s/ Leila E. Mustafa*</u>
Charles D. Swift
D.C. ID No. 987353
Christina A. Jump
D.C. ID No. TX151
Leila E. Mustafa
D.C. ID No. TX169
833 E. Arapaho Rd., Suite 102
Richardson, TX 75081
Tel: (972) 914-2507
Fax: (972) 692-7454
<u>cswift@clcma.org</u>
<u>cjump@clcma.org</u>
<u>lmustafa@clcma.org</u>
*Counsel for Plaintiff*

## **VERIFICATION OF COMPLAINT**

I, Mohammed Jibril, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on this ___13___ day of ___August___, 2019.

## **VERIFICATION OF COMPLAINT**

I, Aida Shahin, declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Aida Shahin*

Executed on this ⎯13⎯ day of *August*, 2019.

## **VERIFICATION OF COMPLAINT**

I, Ala'a Jibril, declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

*Ala'a Jibril*

Executed on this *13* day of *August*, 2019.

## **VERIFICATION OF COMPLAINT**

I, Khalid Jibril, declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct to the best of my knowledge, information, and belief.

_____

Executed on this ___13th___ day of ___August___ , 2019.